MORRISON COHEN LLP
Robert K. Dakis, Esq.
David J. Kozlowski, Esq.
909 Third Avenue
New York, NY 10022
212-735-8600

*Counsel to Churchill Real Estate Fund LP,*
*Specialty Credit Holdings, LLC, and Silver*
*Point Select Opportunities Fund A, L.P.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
| |
In re: | Chapter 11
|
19 Highline Development LLC, | Case No. 18-12714
|
                Debtor. |
-----------------------------------------------------------------x

## APPLICATION FOR ENTRY OF AN ORDER DIRECTING THE EXAMINATION OF AND PRODUCTION OF DOCUMENTS BY JASON LEE UNDER FEDERAL RULE OF BANKRUPTCY PROCEDURE 2004

      Churchill Real Estate Fund LP ("Churchill"), Specialty Credit Holdings, LLC ("Specialty Credit"), and Silver Point Select Opportunities Fund A, L.P. ("SPSO Fund," and with Churchill and Specialty Credit, "Movant"), by its counsel, Morrison Cohen LLP, seeking the entry of an order pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rule 2004") authorizing and directing the examination of and production and turnover of documents by Jason Lee (the "Witness"), respectfully sets forth and represents as follows:

      1.    Movant respectfully requests that this Court enter an Order pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Rules") authorizing and directing the examination of the Witness and the production and turn over by the Witness of all documents

#8108045 v2 \025606 \0016

1

more particularly set forth in the proposed Order and Subpoena are collectively annexed hereto as "**Exhibit A**."

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference of the United States District Court for the Southern District of New York dated January 31, 2012 (Preska, C.J.). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O).

## PRELIMINARY STATEMENT

3. On September 7, 2018, 19 Highline Development LLC (the "Debtor") filed a voluntary petition for relief under chapter 11 of Title 11, United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court").

4. An examination of Witness is necessary because serious accounting and financial irregularities exist with respect to the Debtor and Project 19 Highline Development LLC (the "Mortgage Borrower"), as acknowledged by the Debtor, and Movant, as secured lender of the Debtor, has a significant and immediate interest in investigating these irregularities to protect its investment.

5. The *Declaration Pursuant to Local Bankruptcy Rule 1007-2* [Docket No. 2] (the "1007 Declaration") of E. Michael Rosenstock ("Rosenstock") as Manager and Chief Restructuring Officer of the Debtor references some of these accounting irregularities, noting disputes arose "concerning disposition of certain funds to contractors which were made through

Jason Lee's company, Six Sigma LLC, instead of directly to subcontractors" and that Movant identified issues concerning Mortgage Borrower's compliance with financial covenants and being out of balance on budget projections. 1007 Declaration, ¶¶ 9–10.

6. Until his alleged resignation last week, Witness was the manager of Debtor, which is 100% owner of Mortgage Borrower, an entity formed to develop a luxury condominium project in Chelsea. *See* 1007 Declaration at ¶ 3. Earlier, Churchill learned from a contractor on the project that Witness had opened an account with the contractor and, through his control of the account, misappropriated approximately $292,000 in construction funding in just three months. Churchill also received checks and bank statements supporting these allegations, and immediately contacted Witness. Witness admitted to Churchill that he had taken money earmarked for the contractor, but claimed that he had returned the money to the project. Though Witness agreed to provide records demonstrating that he had not been skimming or demanding kickbacks, Witness cancelled his scheduled meeting with Churchill, refused to provide project financial records, and instead had Rosenstock, who was Witness's corporate lawyer and the attorney who put the initial deal together, along with a criminal defense attorney, call Churchill to try to negotiate a work out.

7. Based on Witness's admitted and flagrant fraud, Movant declared the project's $4 million mezzanine loan in default. In addition, because Witness refused to provide financial records for the project, Churchill undertook its own investigation into Witness, and made a troubling discovery. Witness has faced persistent claims from subcontractors and employees that he has failed to pay them, and more recently has faced claims from other lenders that he is not timely meeting his financial obligations. Another condominium project Witness currently is

developing has also fallen into financial distress, and on information and belief, his investors are questioning his use of funds on that project.

8. In light of Churchill's findings, Movant moved quickly to protect its investment, issuing notices of default and acceleration, and scheduling a disposition sale of collateral for September 10, 2018. In response, Witness allegedly stepped down as Debtor's manager and Debtor filed this bankruptcy case to stop the collateral sale. *See* 1007 Declaration at ¶3. Additionally, Witness's, Debtor's, and Mortgage Borrower's actions have triggered Witness's personal guaranty, on which Movant now seeks to collect pursuant to a forthcoming state court action.

9. Moreover, Debtor's new Chief Restructuring Officer, Rosenstock, was intimately involved in this transaction as Witness's personal corporate lawyer at the time of Debtor's and Mortgage Borrower's dealings with Movant. Movant does not have faith in Debtor's ability or willingness to investigate what Movant believes is a fraud perpetrated by Witness on Movant, Debtor, and Mortgage Borrower. As such, it is imperative Movant be permitted to question Witness and receive the requested documents.

## BACKGROUND

10. Mortgage Borrower, with debtor as its sole member, is developing a 20-unit luxury condominium building located at 435-437 West 19th Street, just steps away from the High Line, in Chelsea, New York (the "Project"). Witness was the manager of Debtor at formation and continued until his recent alleged resignation.

11. In February 2018, existing loans on the Project were refinanced to raise additional capital for the Project. As part of the refinancing, Debtor took out a $4 million mezzanine loan

(the "Mezzanine Loan") with Lender, to assist in paying Project development and construction costs.

12. Simultaneously, Mortgage Borrower and Movant entered into additional loan agreements (the "Additional Project Loans") for loans totaling up to another approximately $36 million. The entire $4 million under the Mezzanine Loan was funded at closing, on or about February 20, 2018. The parties to the Mezzanine Loan and Additional Project Loans contemplated that Debtor and Mortgage Borrower would inject a minimum of $1.6 million in equity into the Project to ensure sufficient funding to complete construction.

13. To induce Movant to provide the Mezzanine Loan, Witness entered into a Mezzanine Guaranty of Recourse Obligations, dated as of February 20, 2018 (the "Personal Guaranty"). Under the Personal Guaranty, Witness personally guaranteed to Movant the payment and performance of the obligations as and when the same shall be due and payable. The Personal Guaranty further requires Witness to reimburse Movant for all out-of-pocket costs and expenses (including court costs and reasonable attorneys' fees) actually incurred by Churchill in the enforcement hereof or the preservation of Churchill's rights. The Personal Guaranty is triggered by a number of events, including but not limited to any fraud or intentional material misrepresentation by Debtor, Mortgage Borrower, Witness, or any of their agents or affiliates, the misappropriation or misapplication of loan advances, or any bankruptcy by Debtor.

14. As is typical in a construction financing, rather than pay Mortgage Borrower the full loan proceeds at the closing, Movant required Mortgage Borrower to submit draw requests to obtain funds under certain of the Additional Project Loans. The draw requests indicate the work performed and the contractor who performed the work, and include lien waivers from the

contractors. Movant would then provide Witness with checks made out to the contractors performing the work, rather than to Mortgage Borrower or to Witness.

15. Mortgage Borrower submitted draw requests for Project construction funds on or about April 12, May 18, and June 19, 2018. Movant promptly funded each draw request. On July 27, 2018, Movant received a fourth draw request, which primarily sought funds for steel, concrete, and demolition work.

16. By the time the fourth draw came in, Movant became concerned about the Project schedule and the apparently delayed construction, which contradicted Witness's upbeat progress reports. As with the previous draw request, the fourth draw request primarily sought funds for the vendor ABC Select. Churchill contacted ABC Select directly to inquire about the Project schedule.

17. ABC Select's principal, James Labate ("Labate"), explained that ABC Select was not working on the site consistently because it had not been paid for its work. Labate further explained that Movant had provided Witness with checks made out to ABC Select totaling approximately $364,336 for its work on the project, but that ABC Select had received only approximately $70,000.

18. Labate further explained that Witness had required ABC Select to establish a company bank account at TD Bank and add Witness as a signatory on the account. Upon information and belief, Witness would pick up draw checks for ABC Select from Churchill on approved draw requests, deposit the money into the ABC Select bank account, then transfer the funds to another TD Bank bank account controlled by Witness.

19. On or about July 30, 2018, ABC Select provided Churchill with bank statements showing that deposits in amounts correlating to when the Movant draw checks were being deposited into the ABC Select account and promptly transferred out, starting on or about May 11, 2018. Upon information and belief, Witness returned only approximately $72,000 of the $364,000 for which Movant had written checks to ABC Select.

20. On July 31, 2018, the day after ABC Select provided Churchill with copies of the bank statements. Churchill immediately became concerned that each draw request was fraudulent and that the lien waivers provided to induce Churchill to release funds were, in essence, ineffective as funds never went to the contractors. Churchill contacted Witness about ABC Select's allegations. Witness did not deny taking money from ABC Select, or depositing funds earmarked for ABC Select into an account he controlled, and then transferring such funds to his own/affiliate accounts, but stated that he was entitled to the money because ABC Select owed him for supplies. He further claimed that he had put all of the money he took from ABC Select back into the Project, so there was no possible harm to the Project. Churchill requested proof that the money Witness took from ABC Select had been directed back into the Project. Witness did not have the financial records immediately available, but agreed to provide them the next day.

21. The following morning, Witness confirmed the meeting and indicated he was compiling information. Instead of a meeting, however, Rosenstock and Witness's new criminal defense counsel called, offering to discuss the loans and the Project. Through counsel, Churchill stood firm on its demand that Witness provide records showing that the funds he took from ABC Select were used for the Project. Despite his claims that he had taken money from ABC Select for the Project, Witness simply refused to provide financial records supporting his claim.

22. On August 8, 2018, when Witness remained unable to provide any records showing that the funds he diverted from ABC Select were used for the Project, Movant served Debtor with a notice of default on the Mezzanine Loan (the "Notice of Default"). Contemporaneously, Movant provided notice to Witness under the Personal Guaranty ("Guarantor Notice").

23. After declaring default, Movant investigated Witness further to understand whether Witness was diverting Project funds. This investigation confirmed Churchill's concerns, as it discovered substantial evidence of Witness's financial distress and prior misconduct.

24. Project employees, including Witness's Project manager Mohamed Hassan Khattab, stated that Witness had stopped paying salary in or about mid-July 2018, while Churchill was still funding construction draws. Churchill further learned that Witness's subcontractors have claimed previously that Witness has not paid them.

25. For example, in *8th Avenue H&Y Duet v. Jason Lee*, N.Y. Sup. Ct. Index No. 155124/2013, the plaintiff claimed that it had retained Witness and his company to perform construction work, and that Witness not only did not complete the work, but that Witness's subcontractors claimed they had not been paid, requiring the plaintiff to pay them off to forestall mechanic's liens.

26. Similarly, in *Fesk Specialty Systems, Inc. v. Jason Lee*, N.Y. Sup. Ct. Index No. 153712/2012, the plaintiff claimed that Witness had not properly paid a project contractor, and in *Ho Jun Song v. Jason Lee*, N.Y. Sup. Ct. Index No. 651612/2016, a former employee claimed that Witness had neither paid him nor reimbursed company expenses.

27. Witness also has faced problems with his lenders. Recently, a lender loaned Witness $120,000 for a three week period. Because of a scrivener's error, the loan maturity was incorrectly listed for one year later, rather than one month later. Despite contemporaneous communications showing that the parties only intended a one-month loan, Witness has refused repayment, leading to a lawsuit. *See*, *Jay Taub v. Jason Lee*, N.Y. Sup. Ct. Index No. 152091/2018. Witness previously settled a case in 2011 based on another alleged failure to repay a loan. *See*, *Spread LLC v. Jason Lee*, N.Y. Sup. Ct. Index No. 107038/2010.

28. Moreover, a lien search showed that on June 15, 2018, the New York State Department of State issued a tax warrant against Witness individually and as a responsible person of his holding company Six Sigma NYC Inc. for $5,000.

29. Witness is working on another luxury condominium project. Upon information and belief, Witness's project is in financial jeopardy, and Witness's investors have begun questioning him about his use of funds on that project as well.

30. Against this backdrop, Churchill's concerns are further heightened because of the press articles and social media accounts of Witness's lavish lifestyle. By his own admission in an article in the online publication "The Real Deal," Witness used to be driven around in a Mercedes all day and used to spend two to three nights a week "clubbing" in the expensive New York market. His Instagram account suggests a continued commitment to an expensive lifestyle.

31. Movant served Debtor and Witness with a notice of acceleration on the Mezzanine Loan and a demand for immediate payment on August 28, 2018. Contemporaneously, Movant provided a notice of disposition of collateral under the Mezzanine

#8108045 v2 \025606 \0016

Loan, indicating that they would sell the collateral securing the Mezzanine Loan in a public sale to be held on September 10, 2018.

32. Debtor filed the voluntary petition for bankruptcy relief on September 7, 2018, the business day before the noticed public sale of the Mezzanine Loan collateral. In the 1007 Declaration, Rosenstock, stated that Witness allegedly had named Rosenstock as manager and chief restructuring officer for the Debtor, and contemporaneously stepped down as manager of Debtor.

33. Movant now seeks to examine Witness and obtain all of the documents identified in **Exhibit A** maintained by, or in the possession of, Witness for the purpose of determining the nature, scope, and extent of the financial irregularities and alleged wrongdoing.

### FEDERAL RULE OF BANKRUPTCY PROCEDURE 2004

34. Federal Rule of Bankruptcy Procedure 2004 provides that "[o]n motion of any party in interest, the Court may order the examination of any entity" with regard to the "acts, conduct, or property or to the liabilities and financial condition of the debtors, or to any matter which may affect the administration of the debtors' estate..."

35. Examination and document production under Rule 2004 is necessary here because an examination cannot proceed under either Rule 7030 or 9014. There are no adversary proceedings or contested matters regarding the foregoing at this time. Because the subject of this investigation affect the administration of the estate and is integral to the underlying purpose for which Debtor filed this bankruptcy proceeding, the relief sought is proper.

36. In this case, the examination of the Witness and production of documents, regarding the type, nature, and extent of the accounting irregularities and actions performed by,

#8108045 v2 \025606 \0016

through, or on account of the Witness and the methods and reasons therefor, is critical. Witness may have procured funds from the Lenders by fraud, and if, as all available evidence suggests, contractors were not paid, the Debtors' sole asset, here equity interests in a real estate project, may be functionally worthless. Additionally, it is incumbent on Lenders, as the sole creditor of this estate, and potentially the lone legitimate creditor of the Mortgage Borrower, to conduct this investigation. The Debtor's CRO was intimately involved in the transactions at issue here – Rosenstock was the attorney who represented the Debtor and their principal in the drafting of the underlying loan documents and represented the Debtor and Lee in negotiations with Lenders in an attempt to work out the default. Rosenstock's transition from attorney and agent of Lee to business person on the deal does not cleanse either him or the Debtor from the deeds of its prior principal, and permitting Rosenstock to direct an investigation into his own client is tantamount to permitting Lee to investigate himself.

37. While this case is not the typical melting ice cube, there is no small measure of urgency here. Lee perpetrated a scheme whereby he potentially absconded with funds earmarked for legitimate creditors of this estate. Every day that a proper investigation and tracing is delayed is a day that nearly $300,000 becomes harder to recapture. The Lenders, and indeed all creditors, are entitled to know what exactly happened here, and therefore exigent relief is not only appropriate, but critical.

**NOTICE**

38. Notice of this Application has been given to (i) the Office of the United States Trustee for Region 2; (ii) the Debtor and its counsel; (iii) Jason Lee; and (iv) all other persons

who have filed notices of appearance in this case. Movants submit that no other or further notice is required.[1]

WHEREFORE, Movant respectfully requests that this Court enter an Order granting Movant's Application Under Federal Rule of Bankruptcy Procedure 2004 directing the Witness's examination and production of documents, and such other and further relief as this Court deems just and proper.

Dated: New York, New York
September 11, 2018

MORRISON COHEN LLP
Counsel to Churchill Real Estate Fund LP,
Specialty Credit Holdings, LLC, and Silver Point
Select Opportunities Fund A, L.P.

By: /s/ Robert K. Dakis
    Robert K. Dakis, Esq.
    David J. Kozlowski, Esq.
    909 Third Avenue
    New York, NY 10022
    212-735-8600

---

[1] Churchill believes Debtor's counsel in this case, Goldberg Weprin Finkel Goldstein LLP, has significant conflicts due to the firm's current representation of Churchill in other matters. Providing notice as indicated herein in no way waives these conflicts.

#8108045 v2 \025606 \0016